THE TOWN OF SEAFORD, a Municipal Corporation
of the State of Delaware,

*vs.*

EASTERN SHORE PUBLIC SERVICE COMPANY, a corporation
of the State of Delaware,
Defendant,

and THE PENNSYLVANIA COMPANY FOR INSURANCES ON
LIVES AND GRANTING ANNUITIES, a corporation of the
Commonwealth of Pennsylvania,
Intervening Defendant.

*Sussex, Nov. 26, 1937.*

*Ralph S. Baker* and *James R. Morford,* of the firm of Marvel, Morford, Ward & Logan, and *William H. Bennethum,* for complainant.

*Frank M. Jones* and *James M. Tunnell,* of the firm of Tunnell & Tunnell, *Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *F. W. C. Webb,* of the firm of Woodcock, Webb, Bounds & Travers, of Salisbury, Md., for the original defendant.

*Daniel O. Hastings* and *Ayres J. Stockly,* of the firm of Hastings, Stockly & Duffy, for the intervening defendant.

THE CHANCELLOR: This cause is now in such condition as to parties that all possible interests will be concluded by its determination.

No attempt has been made by the intervenor to reargue the questions heretofore decided by the opinions to which reference is made in the preliminary statement above made. I adhere to the views upon the law as enunciated in those two opinions.

The Pennsylvania Company raised some new contentions which will be presently noted and passed upon.

The first company to use the streets of Seaford with poles and wires for the furnishing of electricity was a company called Delaware Electric Company. In 1901 this company, which had been placed in receivership, was succeeded by Laurel-Seaford Electric Light Company. The latter company was organized in that year under the General Corporation Act of this State to continue, operate and manage what had theretofore been the public utility business of Delaware Electric Company. The Laurel-Seaford Electric Light Company acquired *inter alia* the rights, franchises and property of Delaware Electric Company in the town of Seaford. It erected posts and poles on the streets of Seaford, strung wires and attached fixtures thereon and conducted its business of supplying electric current for light and heat purposes in the town. It entered into a contract with the town to light the streets of the town for a period of five years commencing on January 1, 1907.

In 1909 Laurel-Seaford Electric Light Company sold its franchises, property, rights, etc, to another company organized under the General Corporation Act of Delaware, known as Sussex Light and Power Company. This company continued to conduct the utility business in Seaford which it had acquired from its predecessor. In 1911 it entered into a contract with the town to supply lighting current to

the streets of the town and to the power-house, council room and firemen's hall, for a period of five years commencing on January 1, 1912.

Until June 9, 1915, there is no written evidence of the life, terms or conditions attaching to the consent which the town had given either to Delaware Electric Company or either of its successors, to occupy the streets of the town with its poles, etc., for the carrying on of the electric utility business. Indeed that the town had given its consent at all is only inferable from the circumstance that the three companies were unmolested in their successive occupancy of the streets with their poles, etc., and that the town had entered into the two street lighting contracts before mentioned.

On June 9, 1915, the town passed an ordinance at the request of Laurel-Seaford Electric Company, by which its consent to that company was granted to occupy the streets, etc, with its poles, etc., upon the terms therein specified. The right conferred by the ordinance was by its terms expressly limited to a twenty year period, expiring on June 9, 1935.

The Sussex Light and Power Company was moved to request the passage of the ordinance because it had negotiated a sale of its property and franchises to Eastern Shore Gas and Electric Company, which later changed its name to Eastern Shore Public Service Company, the name by which it is now sued. The sale was effectuated by the mechanics of a merger of the vendor and vendee corporations. It appears from the evidence that the purchasing corporation demanded as a condition to its favorable consideration of the proposed purchase, that Sussex Light and Power Company should obtain a twenty year franchise from the town. Hence the ordinance, which was enacted, as already stated, at the special instance and request of Sussex Light and Power Company.

The ordinance, in its title, purports to be one granting a right to Sussex Power and Light Company to erect poles, etc., along the streets, etc., for the purpose of distributing electricity for heat, light and power. In its body, the ordinance refers to the right conferred as a franchise.

The solicitors for the Pennsylvania Company make the point that there neither was nor is any power in the town to grant a franchise to use its streets, etc., for electric utility purposes. They point out that the granting of a franchise for such a purpose is a governmental function which inheres in the State and that the State of Delaware has never delegated that function to the municipality of Seaford as its agent. The statutory provision governing the matter was enacted in 1899 (21 *Del. Laws, Ch.* 273, *Sec.* 98), and now appears in its original form as § 2188, *Revised Code* 1935. It is as follows:

"2188. Sec. 156. *Electric Light, Heat and Power Companies; Additional Powers; Use of Public Roads, Streets &c.; Regulations; Consent of Land Owner; Wire Crossing Railroad, Regulated*:—Every corporation organized under the provisions of this chapter for the purpose of constructing, maintaining and operating works for the supply and distribution of electricity for electric lights, heat or power, shall in addition to the powers conferred upon corporations generally, have full power to use the public roads, highways, streets, avenues and alleys in this State for the purpose of erecting posts or poles on the same, to sustain the necessary wires and fixtures; provided that the consent of the Council, Town Commissioners or other persons having control over the public roads, highways, streets, avenues and alleys of the city, town and district in or upon which the said posts or poles are to be erected, shall first, and as a condition precedent be obtained; and provided, further, that no posts or poles shall be erected in any street or any city or incorporated town except in those streets which shall be designated by the said authorities thereof, and then only in such place and manner as shall be thus designated, and that the same shall be so located as in no way to interfere with the safety or convenience of persons traveling on or over the said streets, highways and roads; and that the use of the public streets in any of the cities and incorporated towns of this State shall be subject to such regulations and taxation as may be first imposed by the corporate authorities of such cities and towns; and provided also that no posts or poles shall be erected upon the soil or property of any person or persons without first obtaining the consent in writing of the owner or owners of the soil or property; and provided, also, that any wire crossing a railroad shall not be at a less elevation than twenty-three feet."

As the defendant Eastern Shore and its corporate predecessors in title were all organized under the chapter of which the quoted section is a part, said section is applicable. The section contains a grant by the State to electric light, heat and power companies, of the right to use all the public highways, etc., for the purposes of their business, without limitation as to time. Thus, as the solicitors for the Pennsylvania Company say, a perpetual franchise is granted by the State to such companies, independent of the franchise to be a corporation. The enjoyment of the franchise, however, in any particular instance is conditioned by the statute upon the securing of the prior consent of the proper officials of the town or other local governmental authority. Where this is the situation, the local consent is no part of the franchise. *People ex rel. City of New York v. New York Rys. Co.,* 217 *N. Y.* 310, 318, 112 *N. E.* 49. But where enjoyment of the State-granted franchise is conditioned upon the prior consent of the local governmental agency, it is in the power of the latter to impose terms and conditions upon which its consent is granted, however onerous they may be, which seem to the responsible local officials, in the exercise of their discretion, to be proper. *People ex rel. West Side Street Ry. Co. v. Barnard,* 110 *N. Y.* 548, 553, 18 *N. E.* 354; *People ex rel. City of Olean v. Western N. Y. & Pennsylvania Traction Co.,* 214 *N. Y.* 526, 528, 108 *N. E.* 847; *People ex rel. City of New York v. New York R. Co., supra; Louisville v. Cumberland Telephone Co.,* 224 *U. S.* 649, 658, 32 *S. Ct.* 572, 56 *L. Ed.* 934. The condition imposed by the ordinance of June 8, 1915, with which we are here concerned is the one that limits the duration of the consent to a period of twenty years. With respect to such a condition, it is stated in *Pond on Public Utilities* at *Section* 90, that where the consent of a municipality is made a prerequisite to the exercise of the franchise, it is in the power of the municipality to limit the duration of the franchise period.

While, therefore, the franchise is one that emanates from the direct grant of the State, the condition that the consent of the local governmental agency must be first obtained before the franchise is exercisable, makes the legal result for practical purposes to be as though the franchise were granted by the local unit. *Ghee v. Northern Union Gas Co.*, 158 *N. Y.* 510, 513, 53 *N. E.* 692.

Looking, then, at the substance and disregarding its form, it becomes a matter of indifference whether the right obtained from the municipality be called a franchise or a mere consent, assuming of course that the conditions attaching to the consent are such as the municipality may impose.

It is, of course, permissible for the Legislature to place limitations around the exactions which a municipality may attach as conditions to the granting of its consent. This is as true with respect to a condition of time duration for the privilege, which is the particular condition here involved, as with respect to any other condition. Now in the instant case, did the Legislature place any restriction on the town of Seaford which would prohibit it from limiting the duration of its consent to a definite period? The Pennsylvania Company contends that it did. Such prohibition is not however evidenced by any express language of the statute. *Revised Code* 1935, § 2188. If it is expressed at all, it is so only by implication. That there is such a prohibition, the Pennsylvania Company argues, is clearly implied from the language of the statute. It contends that a careful reading of the statute shows that the only particular in which the State's grant of the franchise is permitted to be made conditioned on the prior consent of the town, is in the particular of the initial erection of the equipment; and that if the consent of the town is given for the erection or construction of a defined line of posts and poles, with their wires and fixtures, the town has exhausted the full power of control which the Legislature intended it should have.

Therefore, it is argued, when the town undertook to condition its consent upon an agreement by the grantee of the State's franchise that it would exercise the same in Seaford for only twenty years, the town arrogated to itself an extent of authority to interfere with the State's grant, which the Legislature has never conferred. In this connection the Pennsylvania Company cites *Dakota Central Telephone Co. v. City of Huron, (C. C.)* 165 *F.* 226, where it was held that if a grant by the State of a franchise to a telephone company to use the public thoroughfare was conditioned on the consent of municipalities merely that the line be "constructed", a municipality could not, as a condition for its consent to the construction, impose a time limit upon the maintenance. Having consented to the construction, the court held that the lawful authority of the municipality had been exhausted.

The effect of this case is, that in such a situation of the law as prevailed in that case and, if the contention of the Pennsylvania Company as to the interpretation of our statute is accepted, will prevail here, a municipality must, in the absence of special provision in its own charter, deny itself the privilege of electric lighting facilities altogether, or grant what in substance is a franchise in perpetuity. Perpetual franchises are fraught with the possibility of such inconveniences and disadvantages to municipal communities and, as time progresses and communities develop, with such a sacrifice of what are essentially public values, that when the question has arisen in the courts as to whether they have been granted by municipalities, the courts have held that neither will the power of a municipality to grant such a franchise be implied, nor, if the power exists, will such a franchise be found from implication. Such power and such perpetual franchises must be clearly evidenced. See *Pond on Public Utilities, (3rd Ed.)* §§ 222, 223.

In this immediate connection, the ordinance of 1915

does not leave any room to contend that the town of Seaford intended by that ordinance, to grant its consent in perpetuance. The twenty year limitation clearly rebuts the idea. But considerations which demand a clear manifestation that municipalities have the power to grant perpetual franchises, or, having the power, have intended to exercise it, ought also to demand that an equally clear manifestation of intent be evident in the interpretation of a statute which is pointed to as requiring that if the exercise of a franchise be consented to by a municipality, the consent must be in perpetuity. An imperative intent of so onerous a character ought to be clearly revealed.

This brings me to a consideration of the statute which I have before quoted in full. It is to be observed first, that what the electric company which desires to construct, maintain and operate a line in any town must obtain from the town is its consent "to use the public roads, etc." It is not a consent simply to "construct", as in the case from 165 *F*. 226, referred to *supra*. It is a consent "to use, etc." Now it requires no elaboration of argument to show that "use" carries a connotation of day to day continuance, while "construct" may be susceptible of interpretation as meaning a single, completed act, which bears no relation to a continuity of time. This feature of the Delaware act renders the case from 165 *F*. of no value as an authority here.

Furthermore, it is to be observed, at a later point in the section it is specifically provided that the "use" of the streets of a town shall be "subject to such regulations * * * as may be first imposed by the corporate authorities." In *Owensboro v. Cumberland Telephone Co.*, 230 *U. S.* 58, 33 *S. Ct.* 988, 57 *L. Ed.* 1389, it was said that a general power in a city "to regulate the streets, alleys, and sidewalks, and all improvements and repairs thereof" [*page* 991], was ample to enable it to prescribe the terms and conditions upon which they could be used. In the instant case the power to regulate which the statute confers on

the town is not conferred in terms of a general jurisdiction over the streets, etc., as in the cited case. Here the power of regulation is fastened upon the very franchise which the State grants, viz., "the use" of the streets. It is therefore clearer than in the cited case, that power existed in Seaford, when it granted its consent in 1915, to impose terms and conditions upon the granted right. If the power existed to impose the terms and conditions upon which Suxsex Light and Power Company could enjoy the right to use the streets of Seaford, there can be no doubt but that it was permissible for the town to place a limit upon the duration of time when such use might continue.

The statute then, as I interpret it, shows by its express language that the town of Seaford had the power to condition its consent for the use of its streets upon the agreement of the recipient of that consent that such use should continue for only twenty years. But even if such intent is not clearly expressed in the statute, certainly it cannot be said that an intent to the contrary is plainly evident.

There is another circumstance, which aside from the statute referred to, which I mention in passing as of some possible significance in its bearing upon the question of whether the town had the power to place a time limit upon the operation of its consent. I refer to the provision in the town charter which confers upon the town councilmen the "superintendence and oversight of all the roads and streets of the town." Whether this provision in the charter confers a power ample enough to permit the council to define the limits of its consent for the use of its streets by an electric company, I do not pause to discuss. I do not do so, because in the view I take of the statute before referred to, such power is amply conferred without reference to the above quoted clause from Seaford's municipal charter.

The conclusion, then, under this head of the discussion is, that after the expiration of the twenty year period the consent theretofore existing expired.

But, it is contended, the town made no objection to the continued occupancy of the streets after the expiration of the twenty year period, and that it is, therefore, now estopped from insisting that Eastern Shore shall remove its poles, etc. The two opinions heretofore filed in this cause in substance dispose of this contention. I shall not repeat or elaborate upon what was there said. On expiration of the specified period for the operation of the permission, no right of extension arose by implication. *Detroit United Ry. v. Detroit*, 229 *U. S.* 39, 33 *S. Ct.* 697, 57 *L. Ed.* 1056. The town was not compelled, immediately upon the expiration of its consent, to oust Eastern Shore from the streets, or as a penalty for its failure to submit to a perpetual franchise. The fact that Eastern Shore spent some money on its plant and facilities after the expiration of the twenty year period, does not estop the town from insisting on its rights. Eastern Shore spent its money with full knowledge of the facts of its situation.

It is contended that the ordinance of 1915 was not binding on Sussex Light and Power Company because no consideration passed to that company. In *Postal Telegraph-Cable Co. v. Ingraham, et al.,* (*D. C.*) 228 *F.* 392, it was held that a consideration to the municipality was not necessary in order to render a franchise valid and so make it beyond the power of the municipality to revoke. *A fortiori* it is true, that consideration moving to the recipient of a limited consent is not necessary to make binding on the recipient the very terms of the granted consent. What, I think, the solicitors for the Pennsylvania Company mean by their contention with respect to consideration is, that Sussex Light and Power Company in whose favor and at whose instance the ordinance was enacted, had no need for it because, as they contend, it was, prior to the enactment of the ordinance, already possessed of a perpetual franchise.

I now notice the contention that prior to the enactment of the ordinance, Eastern Shore's predesessors had a per-

petual franchise. That prior to June 9, 1915, Delaware Electric Company, Laurel-Seaford Electric Company and Sussex Light and Power Company, the predecessors of Eastern Shore, had a perpetual franchise from the State, admits of no doubt. That they also had some sort of consent from the town of Seaford, likewise admits of no doubt. Their unmolested presence on the streets as well as the lighting contracts entered into by the town conclusively demonstrate a permission from the town to occupy the streets with posts, poles, etc. But what were the terms and conditions which attached to the consent? The answer to that question is lost in obscurity. Such of the town's books and records as are available fail to disclose any information touching the so-called franchise, or more accurately speaking, the consent. Upon the important point of the duration of the consent, significant parol evidence was adduced at the hearing. It consisted of the testimony of the present mayor who was a member of the council when Sussex Light and Power Company requested the passage of the ordinance of June 9, 1915, conferring the twenty year right. The testimony was that the petitioning company was represented at the council meeting by its secretary, who stated that his company's franchise was about to expire, that it was desired by his company that a twenty year franchise be granted, particularly because negotiations were afoot to sell the company, and the purchaser would not make the purchase unless a twenty year franchise were secured. The necessary consent of the town was spoken of as a franchise. The then secretary of Sussex Light and Power Company was called as a witness. He did not contradict the testimony of Mayor Donoho. The most he could say was that he did not recall the statement. He had no information concerning the extent and duration of his company's franchise, or the town's consent, prior to 1915. There was an attempt to obviate the effect of Mayor Donoho's recital of the admission made by the spokesman for Sussex Light and Power Company to the effect that its franchise

was about to expire, by the suggestion that the secretary was referring to the then existing street lighting contract rather than to the existing franchise. This suggestion, however, is manifestly not tenable, because the street lighting contract then had over a year and a half of its five year life yet to run.

I am forced to the conclusion that there was a definite limit to the consent existing prior to 1915; that, whatever it was, it was not perpetual. The uncontradicted testimony of Mayor Donoho leads me to that conclusion.

The very fact of the passage of the ordinance with its twenty year limitation, at the solicitation of the company itself, is most strongly suggestive that no consent in perpetuity had theretofore been granted. What was the use of the ordinance if a right already existed larger than that which the ordinance conferred? It is suggested that the purpose of the ordinance was simply to confer a right to lay and construct pipes, conduits and subways in the streets as distinguished from placing posts, poles, wires and fixtures upon the surface thereof. There was an existing right in perpetuity, says the Pennsylvania Company, to erect poles, etc., upon the surface, but none to lay and construct pipes, etc., beneath the surface; and so the ordinance, it is argued, is to be considered in its twenty year limitation to apply only to the right to lay pipes, etc.

This contention I cannot accept. It is pure conjecture. There is no evidence that the company petitioning for the ordinance was desirous of laying pipes, or of constructing conduits or subways. Neither it nor its successor ever has done any of these things. The evidence of what was said at the time shows that what was desired was something to take the place of an existing right, about to expire, which related solely to super-surface structures, viz., posts, poles, wires and fixtures. Not only so, but the ordinance itself includes within the terms of the granted consent, the very

posts, poles, wires and fixtures which it is now suggested had no need to be embraced within its terms.

My conclusion is that the predecessors of Eastern Shore were not possessed of a perpetual right and so conveyed no such right to Eastern shore.

Some contention is made to the effect that the ordinance of 1915 is ineffective with respect to the right to lay pipes and conduits, and build subways, under the streets. Assuming the contentions to be well founded, I am unable to see how it can be of any moment in the instant case. We are not concerned with sub-surface structures. Let the ordinance be good or bad as to them, it would remain valid as to poles and wires on top of the surface.

I have noticed at one place or other in the foregoing all the contentions raised by the Pennsylvania Company which were not discussed in the opinions filed at previous stages of this case—all but one, which raises a question of evidence. To that, I now make brief reference.

At the hearing, the Pennsylvania Company offered in evidence a certified copy of the certificate of incorporation of Laurel-Seaford Electric Company, successor to Delaware Electric Company; and a certified copy of the receivership proceedings of Delaware Electric Company. I was under the impression that these papers were offered to show the nature, extent and duration of the so-called franchise which Delaware Electric Company possessed and which Laurel-Seaford Electric Light Company purchased at the receiver's sale. I thought that while the papers might be admitted for a limited purpose, they were not admissible as against the town of Seaford to show the extent, etc.; of the franchise alleged to have been granted by it.

Upon reading the brief of the solicitors for the Pennsylvania Company, I discover that their sole reason for tendering these documents was to show that Delaware

Electric Company claimed it had the consent of Seaford to use its streets and that such claim was sold to Laurel-Seaford Electric Light Company. If I had understood that to have been the purpose, I would have admitted the documents. It would be permissible to show the chain of title by which Eastern Shore had succeeded to the claims, whatever they were, of Delaware Electric Company. The documents will be admitted as a part of the record for that purpose.

Decree for the complainant.

NOTE.—Upon appeal to the Supreme Court the decree entered in accordance with the foregoing opinion was affirmed. See 23 *Del. Ch.* —, 2 A. 2d 249.